In the Matter of Franklin M. Ketchum and others, Bankrupts.

(*District Court, S. D. New York.* January 10, 1880.)

Partnership— Conversion of Chattels by Act of Partner. — If a firm acting through an agent or one of the partners, while engaged in the regular course of the business of the firm, innocently or wrongfully appropriates chattels, other than money, or what has the quality of money, and sells it, and receives and uses in its business the proceeds, or, without a sale, uses it in the firm's business, the firm is liable for conversion, and it is wholly immaterial that all or any of the members of the firm were ignorant of the wrong committed, or innocent of any wrongful intent.

Same—Conversion of Money by Act of Partner.—The firm is liable for the misappropriation of money under such circumstances where the innocent partner, on the facts proved, appears to have no equity to avail himself of the payment of the money to the firm, as a payment between himself and his copartner, of money in settlement or adjustment of any balance due to him on account of the partnership business, or as a payment of money to him upon any consideration whatever, in receiving which he relied upon his copartner's possession as proof of ownership, where by reasonable inquiry such innocent partner could have discovered the source from which the misappropriated money came.

Same—Conversion by Firm.—A firm is liable for conversion, where an individual partner fraudulently drew and deposited checks and hypothecated securities for the benefit of the firm, without first receiving the proceeds of such checks and hypothecations.

*C. W. Bangs,* for Morris Ketchum.

*C. W. Betts,* for F. M. Ketchum.

*O. E. Bright,* for opposing creditors.

Choate, J.  This is a proceeding to expunge two proofs of debt made and filed by Morris Ketchum.  The bankrupts, Franklin M. Ketchum and Thomas Belknap, Jr., were partners, composing the firm of Ketchum & Belknap, and they were adjudicated bankrupts on the petition of Ketchum, one of the partners, filed August 31, 1878.  They did business as stock-brokers, in the city of New York, down to the twenty-fourth of July, 1878, when they failed.  The proofs of debt now objected to were sworn to by Morris Ketchum and filed July 30, 1879.  One is for the sum of $8,612.37, alleged to be due "upon an account stated between deponent and said Ketchum & Belknap, of which account a copy is hereto annexed."

Annexed to the proof is an account showing sundry items of cash debit and credit between the dates of June 2, 1875, and July 24, 1878, with a balance struck July 24, 1878, to the credit of Morris Ketchum, of $8,549.21, to which interest is added to August 31, 1878, making in all the sum mentioned in the proof of debt, $8,612.37. The second proof of debt is for $27,080.69, alleged to be due as "the proceeds of certain stocks and securities which the said Ketchum & Belknap held for this deponent, and belonging to him, which were sold and disposed of by the said Ketchum & Belknap, and said proceeds appropriated to their own use."

There is little or no dispute about the facts. The firm of Ketchum & Belknap was in business from some time in the year 1871 to the time of their failure, except for a period of about eight months after the panic of 1873, when they suspended business. The partner Ketchum had a seat in the stock board, and attended almost exclusively to buying and selling stocks for customers, and other business of the firm out of the office. Belknap attended almost exclusively to the business in the office, the financial affairs of the firm, the raising of money, the drawing of checks, and the charge of the bank account. For several years prior to the failure this alleged creditor, Morris Ketchum, who was the father of Ketchum, the bankrupt, employed the bankrupt Belknap, individually, as his agent and attorney to attend to some parts of his business. He entrusted to Belknap, individually, for safe keeping, large amounts of stocks and securities, which Belknap kept in a tin box, of which he retained the key. The box was deposited in a safe in the office of the firm, to which safe both the partners had access.

Morris Ketchum also kept a deposit account with the Fourth National Bank of New York City, and Belknap individually acted as his attorney in drawing out moneys from this account, upon checks signed by him, in the name of Morris Ketchum. This part of the business done by him for Morris Ketchum was transacted under a power of attorney, executed before the formation of the firm, which authorized Thomas Belknap, Jr., and Franklin M. Ketchum, severally,

to draw and indorse checks and drafts. This power was, in fact, not acted on by Franklin M. Ketchum, but by Belknap alone. Belknap had no authority, as between himself and Morris Ketchum, to draw out any money from the bank, except for the proper use and benefit of Morris Ketchum, nor had he any authority to use or dispose of said stocks and securities except by order of Morris Ketchum. Belknap, without the knowledge or consent of Morris Ketchum, from time to time drew checks, in Morris Ketchum's name, against this bank account for various sums of money, and deposited said checks to the credit of the firm of Ketchum & Belknap in the same bank, where they also kept their bank account. These transactions were wholly without the knowledge of Franklin M. Ketchum until after the failure of the firm, when Belknap informed his partner and Morris Ketchum of the fact that he had misappropriated these funds to the use of the firm by depositing them in their bank account.

Belknap, also, without the knowledge or consent of Morris Ketchum, or of his partner, Franklin M. Ketchum, sold and disposed of some of the stocks and securities belonging to Morris Ketchum, in his possession, and deposited the proceeds of them in the bank account of the firm, and used others of these stocks and securities by hypothecating them with the Fourth National Bank for loans to the firm; and, at the time of the failure of the firm, some of the stocks thus hypothecated were still held by the bank as security for such loans. The proof of debt first above stated, being the balance of an alleged account, consists wholly of moneys thus transferred by means of checks drawn as aforesaid from the account of Morris Ketchum to the account of the firm. The proof of debt second above stated is for the value of the securities so sold, and their proceeds deposited in the firm's bank account, and of those hypothecated with the bank as security for its loans to the firm. At the time of the failure the firm was largely indebted to the bank for over drafts, besides the secured debt above stated.

After the failure and before the filing of the petition in

v.1,no.10—52

bankruptcy, Belknap made entries in the books of the firm crediting Morris Ketchum with the amounts of the several checks misapplied by him as aforesaid, and also entered upon the books of the firm, as of the date of July 24, 1878, a credit of Morris Ketchum "for sundry stocks and bonds, $26,822.50." It is not shown when these entries were made, except that they were in August, 1878, and before the filing of the petition in bankruptcy by Franklin M. Ketchum. In the schedule of debts annexed to his petition the bankrupt Ketchum included the following as unsecured claims of Morris Ketchum: "Sales of sundry stocks and bonds belonging to said Morris Ketchum, and which Ketchum & Belknap were unable to return credited at market value, on July 24, 1878, $26,822.50; interest to August 31, 1878, $198.19." "Balance of book account, receipts and payments of money on July 24, 1878, $8,549.21; interest to August 31, 1878, $63.16." Another unsecured claim of Morris Ketchum is included as to which no question is raised, with the exception of the entries thus made in the books of the firm.

After the failure and the insertion of these items in this schedule of the firm debts, nothing was done by either partner, so far as the evidence shows, by way of adoption by the firm of these contested claims, nor was any account rendered by the firm to Morris Ketchum, or any agreement made between him and the firm in respect to said moneys so received by the firm, or in respect to said securities, other than such as may be, if any, implied by law from the foregoing facts. Franklin M. Ketchum testified that, at the time he inserted these items in the schedule, he knew of the entries made in the books by Belknap, and he put these claims in the schedule because he believed the firm to be liable for the money and stocks to Morris Ketchum. It also appeared, by the evidence, that, at the time of making the schedule, Franklin M. Ketchum knew, by the confession of Belknap, that the money and the stocks had been wrongfully used by Belknap, and that the proceeds had gone into the bank account of the firm. Belknap drew from the firm bank account for his own use, and for the use of the firm, at all times indiscriminately, and

there is no proof that he individually used the money thus wrongfully paid in, except so far as it may be inferred from this indiscriminate drawing on the bank account, which was partly for his own private stock speculations, which were in violation of the partnership agreement; and, at the time of the failure, he was largely indebted to the firm, and his frauds caused, or largely contributed to cause, the failure of the firm.

There is no evidence whatever of an account stated as to the moneys taken from the private bank account of Morris Ketchum and deposited in the bank account of the firm. No account, such as is annexed to the first proof of debt, and which is a copy of the account made up by Belknap in the firm's book, was, so far as appears, ever rendered to Morris Ketchum or assented to by him. Without such assent to the account, either express or implied by failure to object to it upon its being rendered, there can be no account stated. Therefore, if there be any liability of the firm for these moneys the same is misdescribed in the proof, of debt. The question of liability, however, has been argued upon the facts proved, with little regard to form, and if a firm liability exists the proof may be amended or a new proof, according to the fact, may be filed. So in regard to the second proof of debt, so far as regards the securities sold by Belknap, it is clearly stated untruly in the proof of debt that they were held and sold by the firm. As to those securities the liability of the firm, if there is any, arises not from the improper sale of the securities, which was Belknap's individual act, but from the receipt of the money and its subsequent use by the firm. And in this respect, also, if the claim is sustained, the proof may be amended or a new proof filed.

The questions that arise are different as to the money taken from the private bank account, the stocks pledged to the bank for a loan to the firm, and the proceeds of the stocks deposited in the firm's bank account. Upon the argument a large number of cases have been cited, illustrative of the rules of law as to loans made to a partner, where the moneys are by him used for the purposes of the partnership. As to this

whole class of cases the rules of law are well settled, but they afford little or no aid in determining the questions that arise where the money or the property used by the firm is brought in through the fraud of one of the partners in abusing the trust confided to him by a third party.

Where a third party loans money to a partner on his individual credit, his putting that money into the firm creates no contract between the firm and the lender, for the very obvious reason that it was the lender's intention to lend the money to the individual partner, and, as in such a case the money is lent without any restriction as to its use, the borrower may do what he likes with it, and what he does with it is no longer any concern of the lender; and, of course, it makes no difference whatever that the borrower's copartner happens to know, when the borrower pays it into the firm, that he has borrowed it even for the purpose of lending it to the firm.

If a partner, in applying for a loan, however, acts therein as a partner and for his firm, then the firm will owe the money to the lender, even though he did not, at the time, know that the borrower was acting for his firm. At any rate, if he chooses to treat the firm as the borrower, he may do so as in any other case of an undisclosed principal acting through an agent. But it is unnecessary to refer especially to this class of cases, because the principles that govern the present case are not those that relate to the lending of money unattended by fraud or breach of trust.

It is claimed by the learned counsel for the contesting creditors that the rule of law is well settled that where a partner, coming into the possession of money by the abuse of his individual trust, or duty to a third person, puts that money into the firm without any knowledge of the fraud on the part of his copartners, no obligation arises on the part of the firm to pay back the money to the party who, as against the partner so wrongfully paying it in, could demand it; that, though the guilty partner is liable to the person wronged, the firm is not liable; that, though the party wronged, if he can trace the money distinguishable from other moneys in the

hands of the firm, may follow and recover it as his specific property, yet that he cannot maintain an action, as for a debt, or as for money had and received, against the firm for it, if, as in this case, the money is spent and gone.

There are some points in regard to the liability of a firm for the misappropriation of the property of a third party well settled; thus, if the firm has assumed, or is properly chargeable with, any duty in the safe-keeping of the property, the firm is liable for its misappropriation by one partner, although done without the knowledge of the other partners. This rule rests on the familiar principle that, within the scope of the partnership business, each partner is the agent of the firm, and the act of each partner, whether in making a contract, or in performing, or failing to perform, a duty imposed on the firm by contract, is the act of all. And, where one of the partners is employed in a transaction or matter of business fairly within the scope of the business undertaken to be transacted by the firm, the fact that he was specially trusted by the customer, or that the business was transacted, so far as the firm was concerned, exclusively by him, and without the knowledge of the copartners, will not, in itself, make the transaction an individual transaction.

The question is one, in every case, of fact and of the intention of the parties, the principle being that, if the business was fairly, as between the partners themselves, a firm matter, in the benefits of which, under the co-partnership agreement, they were entitled to share, or if the customer, in fact, employed the partner as a member of the firm, engaged in the business, to which the particular transaction belonged, and was justified in so doing by the nature of the business of the firm, as publicly exhibited, then the transaction is a firm transaction, and in every such case the firm must make good all unauthorized intermeddling with the customer's property, by either partner, in violation of the duty which the firm, or he, on behalf of the firm, has assumed with regard to the property.

And it seems that the employment of a member of the firm, carrying on a particular kind of business, as, for in-

stance, that of a stock-broker, or a solicitor in a matter fairly within the line of business done by the firm, though the form of the employment, so far as correspondence or personal intercourse with the customer or client is governed, is with one of the partners only, and it is induced by relations of special friendship with or confidence in him, yet it is presumed to be, as a matter of fact, an employment of him as a member of the firm, thus throwing the burden of showing that the employment was really intended to be personal on the firm, if they deny their liability. *Willett* v. *Chambers*, Cowp. 814; *Devaynes* v. *Noble*; *Clayton's Case*, 1 Mer. 575; *Baring's Case*, 1 Nev. 611; *De Rebeque* v. *Barclay*, 23 Beav. 107.

These, and other similar cases which might be cited, rest on the basis of a violation by the firm of a duty assumed by the firm, under an employment made with, or which, under the circumstances, the firm cannot deny was made with it. They are not, properly, cases of a firm getting into its possession the property of another party by the tortious act of one of the partners; but from the admitted principles of the law of partnership there would seem to be no question that a firm would be liable in trover for the conversion of personal property other than money, or what, by the law merchant, passes for money, under the same circumstances under which an individual would be liable in that form of action.

Each partner being the agent of the firm in the transaction of its business, the firm is liable for the tort of either of its members, if, under the same circumstances, any other principal would be so liable; that is, if the principal has authorized the particular act, or has adopted it, and taken the benefit of it, or, without special authorization, it was done by the agent in the course of and as part of his employment. The test of liability for trover or conversion of chattels is the unauthorized exercise of such dominion over them as is inconsistent with the rights of the true owner. *Bryce* v. *Buckway*, 31 N. Y. 490; *Heald* v. *Carey*, 11 C. B. 977; *Cobb* v. *Dows*, 10 N. Y. 335; *Helbery* v. *Hatten*, 2 H. & C. 822.

That the sale or hypothecating of chattels, without authority, is a conversion, is too clear to need authority; and

it is wholly immaterial whether the unauthorized sale, or pledge, or other act of conversion, was knowingly wrongful, or, in fact, wholly innocent, done under a mistake as to the title or the right of the party making the sale or pledge. (*Same cases.*) That ignorance of the fact that the property belongs to another, and the want of intent to commit a trespass upon it, constitutes no defence to an action of *trover*, is in conformity with the rule of the common law that no man can (with certain exceptions not here needful to notice) be deprived of his property without his own consent, and that his permitting another to have the possession of his chattels does not carry with it such an *indicium* of title as authorizes or justifies any other party, dealing with the party so in possession, to rely upon that possession as evidence of title. *Ballard* v. *Burgett*, 40 N. Y. 314.

The owner may estop himself by declarations, real or written, creating or importing an apparent title on which parties dealing with the person may rely. This, however, is only where, upon the principles of estoppel *in pais*, the prevention of possible or intended frauds makes it necessary in favor of persons parting with value, or altering their condition for the worse by reason of the reliance on the declarations that the title shall be held to pass. *Moore* v. *Metropolitan Bank*, 55 N. Y. 41.

Clearly, then, with this exception of a case of estoppel, all the world deals with chattels, wherever found, at the peril of liability for trover, if in fact they belong to another, or the party dealing with them has in fact no right to them. If one is misled by another's possession and apparent ownership of them it is his misfortune, for which the owner is not responsible, and which constitutes no legal defence to a claim for their conversion.

If, therefore, a firm, acting through an agent or one of the partners, while engaged in the regular course of the business of the firm, innocently or wrongfully appropriates chattels, other than money, or what has the quality of money, and sells it, and receives and uses in its business the proceeds, or, without a sale, uses it in the firm's business, the firm is liable

for conversion, and it is wholly immaterial that all or any of the members of the firm were ignorant of the wrong committed, or innocent of any wrongful intent. But, when the thing misappropriated is money, other considerations arise, growing out of the nature of money.

It is a maxim of the common law that money has no ear-mark. The peculiarity of money, as distinguished from other chattels, is that the title to it passes by delivery, and any one taking it without notice of any other title to it may safely rely on the title of the party in possession of it. This is essential to its beneficial use as money, and any private mischiefs that may result from the principle are outweighed by the public and general good resulting from its use. Yet the maxim that money has no ear-mark was very early held not to prevent the owner of property wrongfully converted into money from tracing and recovering it, if the money had been again invested by itself in other property, although in the meantime it had been in the form of money in the possession of the wrong-doer.

Thus, in *Whitcomb* v. *Jacob*, 1 Salk. 160, (9 Ann.) it was ruled that, if one employs a factor and "entrusts him with the disposal of merchandise, and the factor receives the money, and dies indebted in debts of a higher nature, and it appears, by evidence, that this money was vested in other goods, and remains unpaid, those goods shall be taken as part of the merchant's estate, and not the factor's; but if the factor have the money it shall be looked upon as the factor's estate, and must first answer the debts of his superior creditor, etc.; for, in regard that money has no ear-mark, equity cannot follow that in behalf of him that employed the factor." See, also, *Scott* v. *Surnam*, Willes, 400.

Modern decisions, however, have so far modified or defined, in its application, the ancient doctrine that money cannot be traced when mingled with other moneys, that it is now established that the owner of property, which has been disposed of without his authority, can recover the proceeds, if the same can be traced, as a part of a particular fund or lot of money, or as part of a deposit of money in bank, though

mingled in such fund or deposit with other money, or into whatever form or new investment the proceeds may be carried, whether of money or property, provided that the rights of third parties have not intervened. And it is the settled rule of courts of law, as well as of courts of equity, that, "where property is tortiously disposed of by one entrusted with it, the title of the owner of the property so misappropriated attaches to the proceeds, whatever may be their form, whether money or anything else; that the substitute for the original thing follows the nature of the thing itself, so long as it can be ascertained to be such." *Taylor* v. *Plumer,* 3 M. & S. 573; *Small* v. *Atwood,* 1 Younge, 537; *Pennell* v. *Deffell,* 4 De G., McN. & G. 386; *Frith* v. *Cartland,* 2 H. & M. 241; *Van Allen* v. *American Nat. Bank,* 1.

Except as against persons who have parted with value for the money which was the proceeds of the property, the title of the former owner of the property to the money remains unaffected, so long as he can trace it.

Money, of course, is lost to the owner, and cannot be recovered, or the receiver held liable for its value, if he took it in good faith, without notice of any other title, in payment of a debt, or for the purchase of property, or for other valuable consideration. But this is the limit of the distinction between money and other chattels. See *Clarke* v. *Shee,* Cowp. 200. And in this case the learned counsel for the opposing creditors concedes that if Morris Ketchum's money still remained in the bank deposit of the firm he could recover it.

It is not very obvious why, if the firm is not liable to an action for money after they had used it, they can justly or consistently be held obliged to restore it if they have not used it, because, if the mode in which they took it does not give them such an equity in it as will enable them to hold it against the true owner, their use of it in their business would seem to give them no new equity or right in it, but would seem, on the contrary, to subject them to an action for money had and received, for having disposed of another's money without authority, if it be, indeed, the case that it was still his, so that he could recover it *in specie.*

But the real question, after all, is whether the circumstances under which the money came to the hands of the firm were such that Franklin M. Ketchum, as the copartner of Belknap, acquired an equity in it, or right to keep it, as being apparently Belknap's money, contributed to the firm by him, which ought to prevent a suit for the recovery against the firm. As to Belknap, or the firm, if his interest in the firm were alone to be considered, it is clear that a suit could be maintained. The only possible equity of Franklin M. Ketchum in the money, upon its being paid into the firm by Belknap, which will take the case out of the general rule, that would allow it to be recovered by the owner, grows out of the nature of money, as stated above. This equity must be based on the fact that Belknap paid it in in the form of money, and, therefore, that his copartner had the right to rely on Belknap's possession of it, as evidence of its being in fact his money; for this is the only distinction that can be drawn between money and other personal property in such a case. In other words, did Franklin M. Ketchum, so far as it was received on his behalf, receive it in payment of a debt or for some other valuable consideration?

The counsel for the opposing creditor relies chiefly on two cases, which, it is claimed, establish the general position that if one partner misapplies trust funds in his hands by paying them into the firm, without knowledge of the fraud on the part of his copartner, the firm is not thereby rendered liable to an action to recover the money. These cases are *Ex parte Apsey*, 3 Bro. C. C. 265, and *Jacques* v. *Marquand*, 6 Cow. 497.

The case of *Ex parte Apsey* was before Lord Chancellor Thurlow, and decided in 1791. The report is very brief, and shows the following facts: On the eleventh of February, 1790, a commission of bankruptcy issued against one Toey. The petitioner Apsey and Edward Allen were chosen his assignees. Edward Allen and James Allen were partners in business, and in April, 1791, a joint commission in bankruptcy was issued against them. Edward Allen, before the issue of the commission against himself and his partner, received

money as assignee of Toey, which he had paid and applied in discharge of the debts of his firm, and otherwise used in their firm business. The question was whether Apsey, as assignee of Toey, could prove for the money so used ·by the firm of Edward and James Allen against their joint estate. Proof was refused, and upon petition to the lord chancellor the decision was sustained.

Counsel for the petitioner cited the cases of *Boardman* v. *Mosman*, 1 Bro. C. C. 68, and *Ex parte Clones*, 2 Bro. C. C. 595. But the lord chancellor said: "In the latter of these cases the partners had agreed to consolidate the separate debts which made the difference. Here, one, by abusing his trust, advances the money to the partnership. That will not raise a contract between the partnership and the person whose money it is."

That the firm will be liable to an action to recover the money, where the other partner knew of the source from which the money paid in was derived, and that it belonged to or was charged with a trust in favor of another party, on the ground that one who aids in the perpetration of a fraud will be equally responsible with the principal wrong-doer, is sufficiently obvious, but it has been frequently so ruled. *Vanderwich* v. *Summerel*, 2 Wash. C. C. 41; *Hutchinson* v. *Smith*, 7 Paige, 33; *Walsin, ex parte*, Ebos. & B. 414; *Smith* v. *Jameson*, 5 T. R. 601.

It would be no answer to the owner of the money, who, waiving the tort, sued for money lent, or money had and received to his use, that what was paid in was money, or that money has no ear-mark, and that it went in payment of the balance due from the partner paying it to his copartner. This was precisely how the proceeds of plaintiff's property had been applied, as between the copartners, in *Vanderwich* v. *Summerel, ut supra*, but with knowledge of the other copartner, and he was compelled to account for it.

But it is entirely consistent with the case of *Ex parte Apsey* that the innocent partner knew of the advance of the money to the firm by his copartner, though he did not know of the breach of trust committed by him in paying it in. It is also

wholly consistent with that decision that the innocent partner assented to and accepted this payment of money, and relied upon its being the proper money of his copartner, and acted upon such reliance in his dealings with his copartner, subsequent to the advance of the money to the firm.

If these facts existed, on which the report is silent, but which, perhaps, may be inferred, upon the general presumption that a merchant keeps himself informed as to his own business affairs, then there is a view of the case which gives the innocent partner an equity to deny his liability for the money, although his firm had the use of it. In such a case, especially if the partner paying in the money is indebted to his copartner on the firm accounts, the innocent copartner may, perhaps, say to the real owner of the money: "It is true this was your money and my firm has received it, and given no consideration for it as a firm, but I received it from the hands of my copartner as money. The law allowed me to rely on his possession of it as proof that it was his own money. I did so. I applied it in our accounts, to the discharge of his indebtedness to me, on firm account. I forebore to press him to make good his account. I have dealt with him ever since, with the same reliance and belief that it was his money. I have kept him as my partner, which I might not otherwise have done. I have given him credit, and now, if you reclaim the money as yours, I shall be injured and put in a worse position, for having relied on his possession as proof of his title, which, by law, I had a right to do, and must, by the law, be protected in doing."

In other words, if, in the case supposed, the innocent copartner has an individual equity, by reason of which the firm should not, on account of his rights, and for his protection, be held liable for the receipt and appropriation to itself, without consideration, of another man's money, it must be exactly that equity which any other party receiving it as money could plead on his behalf, as against the owner, to-wit: that he has received it in payment of a debt, or for the purchase of something of value, which he has parted with in exchange for it, or that he will suffer some injury by reason of his relying

on the apparent title made by the actual possession of it, which injury may be equivalent to the parting with value. For, as pointed out above, and illustrated by the authorities cited, money is, in all things, a chattel, and subject to the law which governs other chattels, except so far as it has the peculiar attribute of money in carrying its title by delivery from hand to hand, and that exception is only made on grounds of public policy for the protection of those who take it as money.

The case of *Ex parte Apsey*, therefore, if it can stand as an authority consistently with more recent decisions, is not an authority for the position that the firm of Ketchum & Belknap could defend against a suit by Morris Ketchum for his money misappropriated by Belknap to the use of the firm, since here it is clearly proved that Franklin M. Ketchum did not even know, till the fraud itself was discovered by him after the failure, that his partner, Belknap, had paid in the money at all. It appears by the proofs that Belknap had exclusive charge of the financial affairs of the firm, and the raising of money for its use; that he alone kept the books; that Franklin M. Ketchum never examined the books, or knew what was in them; that the only entries of these transactions in the books until after the failure, when Belknap wrote them up, was the memorandum of the deposits made in the bank account of the firm in its check-book, where were minuted, among other sums deposited, these sums in question, against some of which were placed the initials "M. K.," denoting to Belknap that it was Morris Ketchum's money, but with nothing to show whether the sums deposited were moneys borrowed or received for debts due the firm, or belonging to the individual partners. Nor, so far as appears, was Belknap ever credited in his account on the firm's books with these sums as money contributed by him. Nor does it appear how his account stood at the time these advances by him to the use of the firm were made.

Thus, a more complete case of the total want of those elements which are necessary to make out an equity on Franklin M. Ketchum's part to this money, on the ground that he,

as between himself and his copartner, took it as money, could not well be made out.

If it is suggested that the mere payment of money into the firm operated *ipso facto*, and because it was money, as a discharge of that amount of the indebtedness of Belknap to his copartner, whether the copartner knew of it or not, and whether he consented to it or not; it may be answered, so far as this case is concerned, that it is not proved that Belknap was then indebted to his copartner in account; but if the parties desire to have the true state of that account appear, in case of an appeal, leave will be given to show the facts. But another answer is, that to hold that payment of the money in, without the knowledge and consent of the copartner, operates, because it is money that is paid in, as a payment, would simply be to apply to the case blindly, and without regard to its reason and nature, the maxim that money has no earmark.

As above pointed out, this rule goes no further than this in protecting the receiver of money, and extinguishing the former title; that the title changes only where the money is received as money, with the *bona fide* belief on the part of the receiver that it was the money of the party paying it. Clearly, Franklin M. Ketchum, if his rights as an individual, in his relations to his copartner, are considered—and it will be observed those are the only rights entitled to consideration—was not such a receiver of this money. It must not be lost sight of in this matter that if the firm is not liable for the money received and used by the firm, through Belknap, with full notice of the rights of Morris Ketchum in it, it is an exception from the well settled rules of the law of partnership, which, for strong reasons of public policy and justice, make the act of one partner, in the course of the firm's business, the act of all, and the knowledge of the one partner, in the like case, the knowledge of all; and the equity of the innocent partner, which is strong enough to countervail and override this well settled and just rule of law, must be a real equity, based on the actual existence of facts, which would ren-

der the application of the ordinary rule of law in the particular case inequitable and unjust.

The suggestion, in *Ex parte Apsey*, that *no contract arises*, cannot be understood as basing the objection merely on the circumstance that there is no promise to repay the money on the part of the firm, but simply that, upon the case made, no implied promise is raised by law; for the action for money had and received, as is well settled, does not rest on privity of contract. It lies wherever one man has, or has received, money which, *ex æquo et bono*, he ought to repay. The common case of money paid under mistake of fact is a good illustration of this; and where trover will lie for the conversion of property, and it has been turned into money, the owner may waive the tort, and bring his action for money had and received. In such a case the law implies a contract to repay, where the party has no equity to retain, the money, or the proceeds of property. *Scott* v. *Surman*, Willes, 404; *Mason* v. *Waite*, 17 Mass. 563.

What is meant by the suggestion of the learned chancellor is, therefore, simply that the case was not one in which the law would imply a promise to repay the money. The views above expressed, as to the necessity of the receiver of money having given a valuable consideration of some kind in order to hold it, or protect himself against an action for it if spent, and as to the true distinction between money and other chattels, are confirmed by the case of *Lime Rock Bank* v. *Plimpton*, 17 Pick. 160.

The case of *Marsh* v. *Keating*, 1 Bing. N. C. 198, cannot, I think, be distinguished in principle from the present case. One Fauntleroy, a partner of the defendants, by means of a forged power of attorney, procured the transfer of the plaintiff's stock and sold the same, and paid the proceeds into the bank account of the firm. He kept the pass-book of the bank in his own custody, and took measures to prevent the deposit from being entered in a book called "the house-book," which was accessible to the defendants, and which, in the due course of their business, should have shown the deposit also.

By this and other devices he concealed entirely from his

copartners the receipt of the money, and afterwards checked it out himself and used it for his own purposes. In the pass-book it was entered "cash per Fauntleroy." The defendants reposed great confidence in Fauntleroy, and allowed him almost exclusively to attend to the banking business. This and other forgeries being discovered long afterward, and Fauntleroy having been executed for some other forgery, the plaintiff sued defendants, his surviving partners, to recover the money paid into the bank. They were shown to be wholly guiltless of the fraud, and to have had no use of the money, except that it had been paid into their bank in the usual course of their banking business by Fauntleroy. No entry of the money appeared in any of the books of the firm except the pass-book, and that they never saw, and never in fact knew of the deposit.

The defendants were held liable on the ground that the firm received the plaintiff's money and had it under their control by being paid into their bank account; that the fraud of their partner, Fauntleroy, afforded no answer to the plaintiff's claim, after the money had once come into their power. The court say: "It must be admitted that they were so far imposed upon by the acts of their partner as to be ignorant that the sum above mentioned was the produce of the plaintiff's stock; but it is equally clear that the defendants might have discovered the payment of the money, and the source from which it was derived, if they had used the ordinary diligence of men of business. If they had not the actual knowledge, they had all the means of knowledge, and there is no principle of law upon which they can succeed in protecting themselves from responsibility, in a case wherein, if actual knowledge was necessary, they might have acquired it by using the ordinary diligence which their calling requires."

The case of *Ex parte Apsey* is not cited, but is consistent with the case of *Marsh* v. *Keating*, that if the defendants had known of the payment into the bank, and, using ordinary diligence, had not discovered the fraud, and had been in fact misled, by the payment being made in money, into believing that the money was Fauntleroy's, and had, in reliance

thereon, dealt with him as their copartner accordingly, and applied it to his account, that they might have been relieved.

The case discloses that the plaintiff was a customer of the defendants' firm, but the liability of the defendants is not rested at all on any fiduciary relation between the firm and the plaintiff, as respects her stocks, but wholly, as it seems, on the receipt of her money.

The case also suggests another ground on which the firm of Ketchum & Belknap must be held liable; that, as Franklin M. Ketchum deliberately left to his copartner all that part of the business which related to the raising of money, he is chargeable with the knowledge of all such facts as he might, with ordinary diligence in attending to his business, have discovered. He constituted Belknap his agent to raise money for the firm. It seems reasonable that he should be held liable, civilly, of course, for what Belknap did in that respect; at least, so far as he might, with reasonable diligence, have discovered the facts. He did not seek to know what Belknap did, or how or where he got money for the firm. The rule laid down in *Marsh* v. *Keating*, for such a case, is the only safe rule of business, since, if the rule were otherwise, partners might purposely keep themselves ignorant of what their partners did, in order to avail themselves of their frauds by reason of their ignorance, and it would be almost impossible to detect such a fraud. Equity helps the diligent. The rule is, also, in accordance with the principle that pervades the law of principal and agent, that the principal is liable, civilly, for the acts of his agent, done in the conduct of his business.

The other case relied on by the opposing creditor is *Jacques* v. *Marquand*, 6 Cow. 497. In that case one member of a firm had misappropriated the plaintiff's property, which he had held upon a special trust, and had used the proceeds in paying debts of the firm; and he pleaded, in abatement, that the other partner was not joined as a defendant. The evidence showed that Paulding, the defendant's copartner, lived in New Orleans, and the defendant in New York, and Paulding knew nothing of the transaction. The court cited

*Ex parte Apsey* for support of the general proposition, which the opposing creditors maintain here, that the payment of money into the firm by the guilty partner does not raise an implied contract to repay on the part of the firm. The distinction above pointed out between this case and Apsey's case existed in *Jacques* v. *Marquand*, but it was not adverted to by the court.

The real point in the case, however, was not whether the firm was liable, but whether Marquand was individually liable. The firm might be liable, and yet Marquand, as the actual wrong-doer, who first misappropriated the money, might still continue individually liable. But, so far as the *dicta* of the learned judge are inconsistent with the views herein expressed, as applicable to the present case, I am unable to concur in them. The case has been several times cited and distinguished, but the precise case seems not .to have arisen again. *Whitaker* v. *Brown*, 16 Wend. 509; *Hutchinson* v. *Smith*, 7 Paige, 33 ; *Willett* v. *Stringer*, 17 Abb. N. S. 155. The chancellor, in *Whitaker* v. *Brown*, seems to take pains to restrict the authority of *Jacques* v. *Marquand* to the precise point that the defence of non-joinder was not good, and the later cases in which it is cited certainly add nothing to its authority.

The point made by the opposing creditors, that Franklin M. Ketchum, or the firm, is not liable because Belknap, after the deposit of these moneys, drew out all or some of them for his own personal uses, is untenable. If, by the receipt of the money, the firm was made chargeable with it, it is no answer that the firm was afterwards robbed of it, or a part of it; much less that a member of the firm, being authorized to draw checks on the firm's bank account, abused that authority by drawing for purposes not authorized by the agreement between the partners. If any authority is needed for this proposition, the case of *Marsh* v. *Keating*, cited above, which was a much harder case than this for the deceived partner, is sufficient.

The claims, therefore, of Morris Ketchum, set forth in the proofs of debt, those proofs being properly. amended, unless

amendment shall be waived, must be sustained on the ground that Franklin M. Ketchum, the innocent partner, on the facts proved, appears to have no equity to avail himself of the payment of the money to the firm, as a payment between himself and his copartner, of money in settlement or adjustment of any balance due to him on account of the partnership business, or as a payment of money to him upon any consideration whatever, in receiving which he relied upon his copartner's possession as proof of ownership.

They must also be sustained on the further ground that Franklin M. Ketchum gave his copartner full and unrestricted authority to raise more money for the use of the firm, without exercising any supervision over his acts in that respect, and without inquiring or seeking to discover how and from what sources his copartner raised money for the firm; that, therefore he is liable, by the law of principal and agent, for the acts of his agent done in the performance of this agency, whether in the making of contracts or in the tortious intermeddling with the property of others, including money, at least to the extent to which he could, by reasonable inquiry, have ascertained the truth; and in this case the circumstances warrant the inference that a very slight attention on his part to the business would have discovered to him the source from which the money came.

But, while the entire claims must be sustained on these grounds, it is evident that the transfer of the money from Morris Ketchum's bank account, and the hypothecating of his securities for a loan to the firm, must be sustained on other grounds. These were not, either in form or substance, payments of money into the firm by Belknap within the rule in Apsey's case, whatever may be the extent and limits of that rule.

The checks drawn against Morris Ketchum's bank account have, by consent of counsel, been produced since the argument, and it appears that they were checks signed "Morris Ketchum, per T. Belknap, Jr., Attorney," and payable to the order of "Ketchum & Belknap."

The deposit of these checks, with other funds, in the bank,

was an act of Belknap in the regular course of the business of the firm. Franklin M. Ketchum, as a partner, is clearly chargeable with notice of the form of the deposit and of the form of the checks deposited, for that deposit was unquestionably a firm transaction, and the checks on their face do not import any title to the money in Belknap. On the contrary, they show that up to the very moment of the deposit the money deposited was Morris Ketchum's money. All that the papers on their face and the acts of Belknap purport to show is that Morris Ketchum had this money in the Fourth National Bank, and that it was his own money, and that Belknap, by drawing the check, represented that he had authority from Morris Ketchum to draw it out and pay it into the firm of Ketchum & Belknap; but whether as a loan or as a gift, or in payment of a debt due to the firm, neither the papers nor the account show at all.

While, therefore, if Franklin M. Ketchum had seen the checks, he might possibly have been misled into believing that Morris Ketchum had given Belknap authority to draw out the money and pay it into the firm, it would have been his own folly; and it would not have been any proper inference to be drawn from the facts if he had concluded that the money had in any way become Belknap's. If Belknap had deceived him as to his authority, so far as the form of the check imports authority, it would have been clearly his misfortune, and would not have affected Morris Ketchum's rights. Besides, there was no payment of money to the firm till the check was collected, and this was done by the firm. In fact, both deposits were in the same bank, and the transaction was a transfer from the account of one depositor to that of the other. That transfer was effected after or simultaneously with the deposit of the checks.

That the deposit of the checks by Belknap was a firm transaction, done by him as a partner, and not by him as an individual, is too plain for argument. By that very act, and as an inseparable part of it, and not before it, in order of time, the money of Morris Ketchum was appropriated to the use of the firm. It is impossible to say that the deposit was an

act of the firm and the transfer of the money was not. The two things may be abstractly considered as separate acts, but they were in reality one act, and the firm cannot take the benefit of the one without being responsible for the other.

The case thus differs from the case of the proceeds of the securities sold and the money afterwards paid in. In that case Belknap individually converted the property into money, and then, having the money in hand, paid it in. Here Belknap never had the money, or what purported to be the money, held by him as his own, but he held what purported to show that the money belonged to the firm, or to Morris Ketchum, himself; and the firm, not Belknap individually, converted the money, and appropriated it to their own use. If the checks had been drawn by Morris Ketchum, payable to Belknap's order, and by him indorsed to the firm, there might be some ground for holding that the firm received money from Belknap; but on these facts they received what did not purport to be his money, and cannot, as to this part of the case, invoke in their defence the rule that they are not liable to repay money paid in by a partner, which in fact belongs, without the knowledge of the other partner, to a third party.

Similar considerations apply to the stocks hypothecated to the bank for a loan. The raising of money by loan was a firm transaction, especially committed by the firm to Belknap. He pledged certain securities, which may be assumed to be in such form that they passed by delivery. He presented them to the bank in this form. Nothing else appears as to any representation of title. The borrowing and the pledge were one act. The firm converted the securities by hypothecating them. One of the partners, as a member of the firm, handed them to the bank as securities of the firm.

The transaction did not purport on its face that the securities were Belknap's, but rather that they were the firm's. If Franklin M. Ketchum had been present and witnessed the transaction there would have been no more reason for him to conclude that they were Belknap's than that they were the firm's. The ordinary presumption that a man knows his own business, and, therefore, that he knew the firm owned

no such property, cannot be drawn in this case, because, on the proofs, Franklin M. Ketchum knew and sought to know nothing of the financial affairs of the firm. He left all that to Belknap. The firm bought and sold and held in their own right stocks. For aught that Franklin M. Ketchum knew Belknap might have bought these stocks for the firm. The circumstances were not such, if they had been known to him, as to justify any inference that the securities were contributed to the firm by Belknap. I see no reason, therefore, why the firm should not be held liable for the conversion of these securities.

It is unnecessary to consider the further question raised and argued whether the entry of these claims as debts in the bankrupt's schedules were such an adoption of them as would alone make the firm liable.

The proofs of debt may be amended conformably to this opinion, then stand as valid claims.